**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**HOMES @ OAKMONT POA, INC.**                                    **PLAINTIFF**

**V.**                              **CASE NO. 5:26-CV-05093**

**STATE FARM FIRE AND CASUALTY COMPANY**                        **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

At present, this Court considers State Farm Fire and Casualty Company's ("State Farm") Partial Motion to Dismiss (Doc. 25) and Brief in Support (Doc. 26); Homes @ Oakmont's ("Oakmont") Response in Opposition (Doc. 29) and Brief in Support (Doc. 30); and State Farm's Reply (Doc. 33). Because Oakmont's Amended Complaint does not set forth a plausible bad faith claim, State Farm's Motion is **GRANTED**, and Count II of the Amended Complaint is **DISMISSED**.

### I. BACKGROUND

Oakmont owns an interest in nine residential properties that sustained roof damage during a tornado on May 26, 2024. These residential properties were insured through State Farm. Oakmont states its policy with State Farm "was represented to be a residential community association full replacement cost insurance policy . . . that would fully cover the cost of replacing the exterior and community items on the Property to their pre-loss conditions." (Doc. 21, ¶ 14).

According to the Amended Complaint, Oakmont reported the roof damage to State Farm within twenty-four hours of the storm, and State Farm sent an independent adjuster to the property a few weeks later, in mid-June 2024. *Id.* ¶¶ 37, 38. The adjuster told Oakmont he felt "all nine residential roofs needed to be replaced as a result of the storm,

1

and his estimate totaled approximately $750,000 . . . ." *Id.* ¶ 39. State Farm rejected the adjuster's recommendation and on July 23, 2024, reported to Oakmont that only one building needed a new roof, and the rest of the damage could be addressed by replacing "certain shingles or certain roof slopes, depending on the building." *Id.* ¶ 41. State Farm offered Oakmont $210,003.22 in damages, but once depreciation costs and the deductible were factored in, they paid only $51,354.49. *See id.* ¶ 44.

Oakmont disagreed with State Farm's estimate. In October 2024, State Farm sent an engineering firm to the property to inspect the windows for storm damage. *See id.* ¶ 49. Following this inspection State Farm paid another $6,147 for window repairs. *See id.* ¶ 50. The roof repair estimate did not change, though, and Oakmont remained dissatisfied. It hired four independent roofing contractors to assess the roofs, and all four recounted that "all nine residential roofs were irreparable." *Id.* ¶ 52. Oakmont then submitted the roofers' opinions to State Farm in February 2025, but State Farm ignored them. *See id.* ¶¶ 52–53. Next, Oakmont hired an engineering firm called Valor Forensics, which sided with Oakmont that State Farm's roof repair plan was "not feasible." *Id.* ¶ 55.

In May 2025, State Farm agreed to inspect the nine roofs again, and Oakmont gave State Farm a copy of Valor Forensics's engineering report. *See id.* ¶¶ 56, 58. On June 23, State Farm agreed to replace a second roof and increased the total estimated damages to $343,672.90. *See id.* ¶ 60. In July, State Farm revised the total estimated damages to $370,062.00. *See id.* ¶ 64. Still unsatisfied, Oakmont filed a complaint against State Farm in March 2026 with the Arkansas Insurance Department. *See id.* ¶ 71. In April 2026—nearly two years after Oakmont first reported storm damage—State Farm

agreed to repair all nine roofs and paid Oakmont an additional $232,421.59 on the original claim. *See id.* ¶ 72.

Throughout the Amended Complaint, Oakmont articulates a company-wide Scheme "to minimize the amounts paid on storm-related claims like Plaintiff's." *Id.* ¶ 7. According to Oakmont, State Farm's practice is to narrowly define certain policy terms, like "covered wind and hail damage," in a way that is "absent from the four corners of the policy." *Id.* ¶ 21. As a result of this practice, State Farm only considers "the most extreme and catastrophic types of damage caused by wind and hail" to be covered losses. *Id.* ¶ 23. Oakmont further alleges that State Farm trains its adjusters to evaluate claims using these exceedingly narrow definitions of policy terms in order to advance the "overall collective corporate goal of increasing profits through the systematic underpayment and denial of valid claims." *Id.* ¶¶ 24, 25, 98. Oakmont's view is that the policy's terms should be interpreted more broadly to allow full reimbursement of all accidental direct physical loss. *See id.* ¶ 23. Oakmont also contends State Farm's pricing of labor and materials is "lower than industry standard pricing and lower than pricing State Farm use[s] when calculating those same materials and labor for the purpose of determining Plaintiff's premium." *Id.* ¶ 77.

In Count I of the Amended Complaint, Oakmont alleges State Farm breached the insurance contract by failing or refusing to timely pay all benefits owed. The present motion to dismiss does not address Count I. In Count II, Oakmont asserts State Farm committed the tort of bad faith for numerous reasons all related to either the contractual value dispute between the parties or the Scheme. "At a minimum," Oakmont alleges State Farm acted in bad faith by:

    a. Ignoring Valor Forensics' engineering report;
    b. Ignoring estimates submitted by Plaintiff from trusted contractors;
    c. Ignoring the opinions of State Farm's independent adjuster;
    d. Refusing, without proper cause, to pay Plaintiff all benefits owed under the Policy and pursuant to Arkansas law;
    e. Engaging in an outcome-oriented investigation on Plaintiff's Claim designed to deny and/or reduce the amount of money paid to Plaintiff for the Claim;
    f. Disregarding the documented wind speeds occurring at the Property on May 26, 2024;
    g. Disregarding industry-recognized forms of wind damage;
    h. Limiting Plaintiff's rights;
    i. Reducing the fair amount of Plaintiff's Claim through training and internal practices intentionally created for that purpose;
    j. Forcing Plaintiff to retain an engineer and counsel to recover insurance benefits owed under the Policy;
    k. Implementing the Scheme; and
    l. Engaging in the Scheme and improper claims practices, as enumerated in the foregoing paragraphs, knowing its insured would suffer financial harm.

*Id.* ¶ 94. State Farm now moves to dismiss Count II, arguing that the Amended Complaint

"does not, on its face, present a plausible cause of action for the tort of bad faith." (Doc.

26, p. 7).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8 requires that complaints contain "a short and

plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P.

8(a)(2). As such, the "complaint must contain sufficient factual matter, accepted as true,

to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009). "Determining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience

and common sense." *Id.* at 679. At the pleading stage, "the complaint should be read as

a whole, not parsed piece by piece to determine whether each allegation, in isolation, is

plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

4

## III. ANALYSIS

In Arkansas, "[t]he standard for establishing a claim for bad faith is rigorous and difficult to satisfy." *Unum Life Ins. Co. of Am. v. Edwards*, 362 Ark. 624, 627 (2005). The Supreme Court of Arkansas defines bad faith as "dishonest, malicious, or oppressive conduct carried out with a state of mind characterized by hatred, ill will, or a spirit of revenge." *Switzer v. Shelter Mut. Ins. Co.*, 362 Ark. 419, 433 (2005). Importantly, "[m]ere negligence or bad judgment is insufficient so long as the insurer is acting in good faith," and "bad faith does not arise from a mere denial of a claim; there must be affirmative misconduct." *State Auto Prop. and Cas. Ins. Co. v. Swaim*, 338 Ark. 49, 56 (1999).

None of Oakmont's factual allegations support a plausible inference that State Farm committed affirmative misconduct motivated by "hatred, ill will, or a spirit of revenge." *Switzer*, 362 Ark. at 433.

The Amended Complaint primarily asserts a dispute over the valuation of Oakmont's claim and accuses State Farm of purposefully "ignoring" the damage valuations of State Farm's own independent adjuster, Oakmont's contractors, and Oakmont's engineers. (Doc. 21, ¶ 94). Disputes over the value of a claim do not support bad faith in Arkansas, especially when the insurer does not issue an outright denial. *See Watkins v. S. Farm Bureau Cas. Ins. Co.*, 2009 Ark. App. 693, *14 (Ark. Ct. App. 2009) ("[A]n insurer's refusal to pay a claim cannot constitute wanton or malicious conduct when an actual controversy exists with respect to liability under the policy."); *see also Farm Bureau Ins. Co. of Ark., Inc. v. Running M Farms, Inc.*, 366 Ark. 480 (2006) (finding no bad faith where the insurer's "actions exhibit a dispute over the measure of damages"). The Arkansas Supreme Court has identified bad-faith conduct in very limited, egregious

5

situations, such as "where an insurance agent lied by stating there was no insurance coverage," engaged in "aggressive, abusive, and coercive conduct," "conver[ted] . . . the insured's wrecked car," or "intentionally altered insurance records to avoid a bad risk." *Swaim*, 338 Ark. at 58. Similar affirmative acts of malice are not pleaded here. Rather, Oakmont alleges State Farm paid a certain amount initially and then periodically reassessed the claim, each time increasing the payment. Further, even if these disputes rose to affirmative misconduct, Oakmont does not allege that State Farm acted out of "hatred, ill will, or a spirit of revenge." *Switzer*, 362 Ark. at 433. These claims, therefore, cannot support an action for bad faith.

Although Oakmont asserts that State Farm has adopted a corporate practice of narrowly interpreting policy terms and deems this a "Scheme" to underpay claims, such a dispute over policy definitions and corporate practices sounds in contract and not in tort. While these allegations could indicate State Farm endeavored to low-ball damage estimates nationwide, there is no implication State Farm directed these practices out of hatred, ill will, or a spirit of revenge. Further, to the extent the Scheme manifested against Oakmont, it only contributed to the underlying value dispute that does not support a claim for bad faith in Arkansas.

6

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that the Partial Motion to Dismiss (Doc. 25) is **GRANTED** and Count II of the Plaintiff's Amended Complaint (Doc. 21) is **DISMISSED** without prejudice.

**IT IS SO ORDERED** on this 4th day of August, 2026.

TIMOTHY L. BROOKS
CHIEF UNITED STATES DISTRICT JUDGE